## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | ) | Bankruptcy No. 21-20020-CMB |
|  | ) |  |
| SALEM CONSUMER SQUARE OH LLC, | ) | Chapter 11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
|  | ) |  |
| BELFOR USA GROUP, INC., | ) |  |
|  | ) |  |
| Movant, | ) |  |
|  | ) |  |
| v. | ) | Related to Doc. Nos. 33 and 102 |
|  | ) |  |
| SALEM CONSUMER SQUARE OH LLC, | ) |  |
|  | ) |  |
| Respondent. | ) |  |

*Appearances*:  Ann Marie Uetz, Esq. and William McKenna, Esq. for Movant, BELFOR USA
Group, Inc.
Kirk Burkley, Esq. and Kerri Sturm, Esq., for Debtor/Respondent, Salem
Consumer Square OH LLC

### <u>MEMORANDUM OPINION</u>

The matters presently before the Court are *BELFOR USA Group, Inc.'s Motion for an*

*Order Under 11 U.S.C. §1112(b) Dismissing the Debtor's Case or, in the Alternative, Converting*

*the Case to Chapter 7* ("Motion to Dismiss or Convert," Doc. No. 33) and *BELFOR USA Group,*

*Inc.'s Expedited Motion for an Order Under 11 U.S.C. §1104 Appointing a Trustee to Administer*

*the Debtor's Estate* ("Trustee Motion," Doc. No. 102, together, the "Motions").[1] The Motions are

---

[1]    Pursuant to 28 U.S.C. §§1334 and 157, this Court has subject matter jurisdiction. Further, this is a
core matter pursuant to 28 U.S.C. §157(b)(2)(A).

opposed by the Debtor, Salem Consumer Square OH LLC. An objection to the Trustee Motion was also filed by Beacon Commercial Limited ("Beacon"). For the reasons set forth herein, this Court finds that the Motions must be denied based on the record at this time. However, the Court reserves the right to appoint a trustee *sua sponte* if future circumstances demonstrate that Debtor is unable to faithfully discharge its fiduciary duties.

<u>Background & Procedural History</u>

The above-captioned case was commenced on January 5, 2021, when Debtor filed its petition seeking relief under Chapter 11 of the Bankruptcy Code. The petition was filed in this district as cases filed by Debtor's affiliates are pending in the Western District of Pennsylvania. Disputes between the Debtor and one of its creditors, BELFOR USA Group, Inc. ("BELFOR"), preceded the filing and have been ongoing throughout this case. Approximately one week after the petition was filed, BELFOR filed the Motion to Dismiss or Convert. Nations Roof of Ohio, LLC ("Nations Roof"), another creditor, filed a joinder. *See* Doc. No. 64. Debtor filed an objection. *See* Doc. No. 65. Following the initial hearing on the Motion to Dismiss or Convert held February 23, 2021, the parties conferred and agreed upon discovery and related deadlines in preparation for an evidentiary hearing.

Approximately sixty days into the case, while discovery on the Motion to Dismiss or Convert was ongoing, Debtor filed its *Chapter 11 Plan of Reorganization Dated March 5, 2021* ("Plan," Doc. No. 94) and *Disclosure Statement to Accompany Debtor's Amended Chapter 11 Plan of Reorganization Dated March 5, 2021* ("Disclosure Statement," Doc. No. 95). On the same date, Debtor commenced an adversary proceeding against BELFOR by filing its *Complaint to (I) Determine Amount, Priority and Extent of Secured Status Pursuant to 11 U.S.C. §506(a) and (II)*

2

*Determine Amount of BELFOR Group U.S.A., Inc.'s Allowed Claim* (the "Adversary Complaint").
*See* Adv. No. 21-2019. Discovery deadlines have been set in the adversary proceeding.

Several days after the filing of the Plan, Disclosure Statement, and Adversary Complaint, BELFOR filed the Trustee Motion. Objections were filed by both Debtor and its owner, Beacon. *See* Doc. Nos. 106 and 107. Following an expedited hearing on the Trustee Motion, the Court scheduled an evidentiary hearing. Ultimately, the parties agreed to participate in mediation, and the Court rescheduled deadlines and hearings to accommodate the attempt to consensually resolve the parties' disputes, including the Motions now before the Court. Following the report of an unsuccessful mediation, a flurry of activity followed. Debtor and Beacon filed a joint expedited motion seeking to stay BELFOR's Motions while allowing Debtor to first seek approval of its Disclosure Statement and proceed to confirmation of the Plan. BELFOR filed its own expedited motion seeking to compel discovery. The expedited motions were quickly resolved with a determination that BELFOR's Motions would not be stayed. Due to the nature of BELFOR's Motions and the common underlying facts, the Court scheduled a joint evidentiary hearing.

On May 13, 2021, Nations Roof advised that, upon reaching a settlement with the Debtor regarding its claim, it now supports the Plan and withdraws its joinder to the Motion to Dismiss or Convert. *See* Doc. No. 169. At the pretrial conference on the Motions held May 20, 2021, the remaining parties agreed to another attempt at mediation. Unfortunately, the second mediation attempt was also unsuccessful, and the parties returned to their litigation posture. The parties submitted their exhibits and filed stipulated and contested facts. *See* Doc. No. 190.[2] The evidentiary hearing was held on June 14 and 15, 2021. Each party also submitted designations of

---

[2]     Paragraphs 1-33 of Doc. No. 190 are identified as stipulated and uncontested facts and will be cited herein as "Stipulated Facts."

3

deposition transcripts for the Court's consideration. *See* Doc. Nos. 202 and 214. Following the

docketing of the hearing transcripts,[3] Debtor and BELFOR filed proposed findings of facts and

conclusions of law. *See* Doc. Nos. 245 and 246. Each party filed a reply. *See* Doc. Nos. 250 and

252. The matters are now ripe for decision.

<u>Findings of Fact</u>

To understand the basis for the Motions, it is necessary to address certain events that

preceded the bankruptcy filing, beginning with a tornado that occurred on May 27, 2019. The

tornado damaged the Debtor's primary asset, a retail shopping mall known as Salem Consumer

Square located in Dayton, Ohio (the "Property"). *See* Stipulated Facts at ¶¶13, 26. As a result of

the tornado damage, BELFOR performed certain work on the Property which forms the basis of

its disputed claim in this case.

At the time of the tornado, Debtor was owned by Moonbeam Capital Investments LLC

("Moonbeam Capital"). *See* Stipulated Facts at ¶4; Exhibit X at 000572. The Property was insured

via a Travelers insurance policy in which Moonbeam Capital was a named insured. *See* Stipulated

Facts at ¶14.[4] With respect to the insurance claim related to the tornado, Travelers made payments

totaling in excess of $9.8 million, with the first payment issued June 7, 2019, and the last payment

issued January 15, 2020. *See* Stipulated Facts at ¶23. Although all seven of the checks issued by

Travelers were made payable to Moonbeam Capital **and** Debtor, all of the payments were

delivered to and received by Moonbeam Capital. *See* Exhibit A; Stipulated Facts at ¶23.

---

[3]     *See* Transcript of Hearing Held June 14, 2021 (Doc. No. 225, "Hr'g Tr. 6/14/21") and Transcript
of Hearing Held June 15, 2021 (Doc. No. 226, "Hr'g Tr. 6/15/21").
[4]     In Debtor's Plan, Debtor states that both Debtor and Moonbeam Capital were named as insureds
on the policy. *See* Exhibit X at 000572.

Moonbeam Capital did not use the insurance proceeds to make repairs to the Property. Hr'g Tr. 6/15/21 at 35:11-13. It is undisputed that BELFOR has not been paid for any of its work at the Property despite the fact that the explanation of payment for at least one check issued by Travelers in the amount of $2,418,981.08 specifically referenced "BELFOR EMS-UNDISPUTED COSTS." *See* Stipulated Facts at ¶¶23-24; Exhibit A at 000005. On September 3, 2019, BELFOR recorded an Affidavit for Mechanic's Lien against the Property in the amount of $3,969,438.04, which was later reduced by BELFOR to $2.8 million plus interest, fees and costs. *See* Stipulated Facts at ¶¶21-22.

During the time insurance checks were being issued by Travelers and received by Moonbeam Capital, Moonbeam Capital transferred its membership interests in the Debtor. With a stated purchase price of $4 million and an effective date of September 27, 2019, Moonbeam Capital entered into an agreement transferring 99.99% of its ownership interests in profits and losses and 100% of its ownership interest in capital to Beacon. *See* Exhibit D.[5] The agreement specifically addresses the treatment of the insurance proceeds received by Moonbeam Capital:

> For avoidance of doubt, Seller shall not sell, transfer, convey or assign, Buyer shall not purchase, and the Subject Interests do not include, any right, title or interest in or to any…insurance proceeds paid or distributed to Seller or received by Seller prior to the Effective Date with respect to the Subject Interests, the Company and/or the Property.

*See* Exhibit D at 000182. As to the $4 million purchase price, Michael Kahaian, a forensic accountant, testified that Moonbeam Capital essentially paid itself by first transferring $4 million into Debtor as a contribution of capital, which was subsequently transferred to Beacon in the form

---

[5]    By corresponding agreement also effective September 27, 2019, Moonbeam Capital transferred its remaining 0.01% interest in profits and losses in Debtor to Bizmax Investments Limited. *See* Exhibit E. Both agreements are signed by Edward Sklyaroff on behalf of the buyer.

of a loan, and ultimately transferred back to Moonbeam Capital in a "roundtrip" transaction. *See* Hr'g Tr. 6/14/21 at 49:24-69:25. Despite the characterization as a loan from Debtor to Beacon, there was nothing to substantiate a loan, and the loan was ultimately written off in the general ledger. *See* Hr'g Tr. 6/14/21 at 66:1-68:4, 90:3-16. Based on his analysis, Mr. Kahaian concludes there was no economic substance to the transaction. *See* Hr'g Tr. 6/14/21 at 61:18-62:3. To the contrary, Debtor asserts there was substance to the transaction based on the language of the assignment.[6] Nonetheless, the purpose of the so-called "roundtrip" transaction was not explained on the record, and regardless of the odd transaction underlying the transfer, Beacon is the current owner of Debtor. *See* Stipulated Facts at ¶1.

Despite the transfer, Debtor's connections with its prior ownership and management were not severed. Edward Sklyaroff, owner and president of Beacon, is also the president of Debtor. *See* Stipulated Facts at ¶¶2 and 25. However, Shawl Pryor is clearly the "boots on the ground" for the Debtor as he oversees day-to-day operations. *See* Hr'g Tr. 6/15/21 at 21:11-20. In fact, Mr. Pryor is the chief operating officer of Beacon and the Debtor. *See* Stipulated Facts at ¶¶3,9. Notwithstanding his important role for Debtor, Mr. Pryor is not paid by either the Debtor or Beacon for his services. *See* Hr'g Tr. 6/15/21 at 30:17-22. Mr. Pryor is, however, compensated through his roles with Moonbeam Capital and Moonbeam Leasing and Management ("Moonbeam Leasing"),

---

[6]    In support, Debtor cites to the testimony of Mr. Sklyaroff and points to the language of the assignment, which provides "in consideration of the mutual promises, representations and warranties contained in the Agreement and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged…." *See* Exhibit D at 000191; Hr'g Tr. 6/15/21 at 12:16-14:3. Debtor asserts that the opinion of Mr. Kahaian fails to account for the value of the interest conveyed or the liabilities assumed. Mr. Kahaian was not asked to value the membership interest in Debtor or the real estate nor did he include contingent liabilities in his analysis as he was unaware of any contingent liabilities documented in financial records. *See* Hr'g Tr. 6/14/21 at 68:15-24, 71:7-72:16. Ultimately, the relevance of the sufficiency of the consideration and the unorthodox nature of this transaction is not entirely clear.

the latter of which continues to provide leasing and management services to Debtor. *See* Stipulated Facts at ¶6; Hr'g Tr. 6/15/21 at 29:25-30:13. Moonbeam Leasing is directly or indirectly owned by Moonbeam Capital. *See* Stipulated Facts at ¶7. Notably, Mr. Pryor has served as chief operating officer for Moonbeam Capital and Moonbeam Leasing and is the current president of each entity. *See* Stipulated Facts at ¶8. In these roles with the Moonbeam entities, Mr. Pryor reports directly to Steven Maksin, who directly or indirectly is the majority owner of Moonbeam Capital. *See* Stipulated Facts at ¶¶5, 8. In addition to the ties between the Debtor on the one hand and the Moonbeam related entities on the other through Mr. Pryor, Mr. Sklyaroff and his related entities have a history of dealings with Mr. Maksin and his related entities.[7]

Furthermore, after the transfer, Debtor and Moonbeam Capital nonetheless remained united in their position against BELFOR. On February 26, 2020, BELFOR filed an action in the Court of Common Pleas in Montgomery County, Ohio ("State Court Action") against Debtor and Moonbeam Capital seeking payment for the work performed and foreclosure of its mechanic's lien. *See* Stipulated Facts at ¶15; Exhibit KK. Debtor and Moonbeam Capital were jointly represented in the State Court Action by the law firm of Elias & Elias, P.C., and answered BELFOR's complaint and amended complaint jointly. *See* Stipulated Facts at ¶17; Exhibits LL and MM.[8] Despite a commitment to produce certain documents in the State Court Action on

---

[7]    For instance, prior to 2014, Mr. Sklyaroff acted as director and bank signatory for the companies with ownership interests in Moonbeam Capital. *See* Depo. Tr. of Maksin 5/19/21 at 40:16-41:10. In addition, since 2018, Beacon received two properties from Moonbeam Capital's subsidiaries and borrowed from Moonbeam Capital to effectuate those transfers. *See* Depo. Tr. of Maksin 6/2/21 at 178:4-179:6.

[8]    The Court also notes BELFOR's position that Debtor's claims of privilege and/or work product in certain pre-petition communications set forth in a privilege log are relevant to show the closeness and the relationship among Debtor, Beacon, Mr. Sklyaroff, and the Moonbeam entities. *See* Hr'g Tr. 6/14/21 at 151:2-152:2. The Court finds the privilege log (Exhibit DD) of little additional value to support BELFOR's allegations as Moonbeam Capital and Debtor were jointly defending against BELFOR in the State Court Action. Therefore, the privilege log is of questionable relevance to establish anything further.

January 5, 2021, upon commencement of this bankruptcy case on that date, non-debtors Moonbeam Capital and Mr. Maksin advised they would not produce documents as a result of the automatic stay. *See* Exhibits P, Q, R. The filing undoubtedly stayed any action against the Debtor; however, the parties clearly disagreed regarding the impact on the non-debtors.

The connections among Mr. Maksin, his related entities, Mr. Sklyaroff, and the Debtor continued through the filing of this bankruptcy case, including accounting services provided to the Debtor by an entity owned by Mr. Maksin and his wife and legal advice provided by Mr. Maksin to Mr. Sklyaroff related to this case. *See* Depo. Tr. of Pryor at 38:8-19; Depo. Tr. of Sklyaroff at 126:19-128:1; Depo. Tr. of Maksin 6/2/21 at 173:9-13, 210:10-18; Hr'g Tr. 6/14/21 at 124:21-127:10; Hr'g Tr. 6/15/21 at 33:23-35:6. Mr. Pryor, of course, remains a connection between Debtor and the Moonbeam entities. Mr. Pryor acknowledges that, as the president of Moonbeam Capital and Moonbeam Leasing, he owes duties of loyalty, disclosure, obedience, and care to those entities. *See* Hr'g Tr. 6/15/21 at 31:4-8. Given his role with the Debtor, Mr. Pryor acknowledges owing the same duties to Debtor as well as owing fiduciary duties to the bankruptcy estate and its creditors. *See* Hr'g Tr. 6/15/21 at 31:9-15. Furthermore, Mr. Pryor asserts that, if required to do so, he is able to take actions adverse to the interests of the Moonbeam entities when he is acting in his role for Debtor. *See* Hr'g Tr. 6/15/21 at 29:11-14. Although Mr. Pryor testified that he is committed to running the bankruptcy estate in the interests of all creditors of the estate, there appears to be acknowledgment of the potential for conflicting duties to these various, interrelated entities and the estate. *See* Hr'g Tr. 6/15/21 at 28:18-25.[9]

---

[9]    Debtor called Yarone Zober as an expert in commercial property development and management. *See* Hr'g Tr. 6/14/21 at 196:20-22, 206:15-207:2. While Mr. Zober testified that the closeness and interconnectedness among ownership and management is common in the world of real estate and development, his testimony is of limited assistance where there are allegations of conflicts of interest with

The State Court Action is currently the sole legal action pending against Debtor seeking to collect outstanding amounts owed. *See* Stipulated Facts at ¶28. However, Debtor was impacted by more than just the burden of ongoing litigation with BELFOR leading up to the filing of the bankruptcy petition. Not only did Debtor lose its anchor tenant in 2020, the global pandemic had a significant impact on the retail industry. *See* Hr'g Tr. 6/14/21 at 179:18-180:2, 180:21-25; Hr'g Tr. 6/15/21 at 24:14-25:14. Only seven tenants remain occupying space in two of the four buildings on the Property. *See* Hr'g Tr. 6/14/21 at 178:11-17, 179:3-7. The two buildings that suffered the most severe damage from the tornado are currently empty, and three buildings remain damaged. *See* Hr'g Tr. 6/14/21 at 179:8-13, 186:12-187:3, 187:24-188:2.

At the time of filing, Debtor provided its list of non-insider creditors holding the twenty largest unsecured claims. Debtor reported having only ten, with the two largest being held by BELFOR in the amount of $2.8 million and Nations Roof in the amount of $153,165. *See* Exhibit R at 000365-66. Both were identified as disputed and unliquidated. The remaining eight claims, totaling approximately $41,000, ranged from $94.43 to $20,407 individually. Notably, Debtor has since reached a settlement with Nations Roof regarding its claim. *See* Stipulated Facts at ¶29.

On March 5, 2021, Debtor filed its Adversary Complaint against BELFOR to determine the amount and secured status of BELFOR's claim. *See* Exhibit 5. On the same date, Debtor filed its Plan proposing to pay allowed claims in full. *See* Exhibit X. The Plan includes a proposed settlement and limited release of Moonbeam Capital, which provides for a payment to Debtor in the amount of $2.8 million. *See* Exhibit X at 000571-73. Debtor describes the circumstances leading to the settlement as follows:

---

respect to such entities and where a debtor-in-possession's fiduciary duties are at issue in the context of a Chapter 11 bankruptcy case. *See* Hr'g Tr. 6/14/21 at 209:4-14, 209:24-210:21, 211:3-212:21.

> Prior to Beacon becoming the Debtor's equity owner in December of 2019, Moonbeam Capital Investments ("MCI") was the Debtor's equity owner. During the time that MCI was an equity holder of the Debtor, a tornado caused substantial damage to the Debtor's Property. As a result of the damage and subsequent services allegedly provided on the Property, the Debtor's insurance company, Traveler's Insurance, issued joint checks in the aggregate amount of $2,800,000 (as previously defined, the "Proceeds") to both the Debtor and MCI since both entities were named as insureds on the policy in question at that time. MCI deposited the Proceeds into its account and the Debtor did not receive the Proceeds. BELFOR's Claim against the Debtor and the estate, though disputed, relates to BELFOR's allegations that it has a right to the Proceeds.
> In order to avoid the time and expense in litigation, MCI has agreed to a settlement in which it pays the Proceeds to the Debtor in order to fund the plan, including any Allowed Claim of BELFOR that it may have.…The Debtor used its business judgement in negotiating and agreeing to the terms of the settlement and, because it provides for a full recovery of the Proceeds while avoiding any additional litigation, the Settlement Agreement is in the best interest of the estate and its creditors.

*See* Exhibit X at 000572. The settlement proceeds are to be used for plan funding. Although the buildings on the Property remain damaged from the tornado, the Plan does not provide for the repair of the Property. *See* Hr'g Tr. 6/14/21 at 140:9-21; Hr'g Tr. 6/15/21 at 26:18-28:17, 37:10-18. The Debtor intends to deal with the creditors first, and the credible testimony supports an intention to redevelop the property. *Id.* As to the additional $7 million of insurance proceeds received by Moonbeam Capital, Debtor has not and is not taking steps to pursue the return of additional insurance proceeds at this time. *See* Hr'g Tr. 6/14/21 at 131:19-24; Hrg. Tr. 6/15/21 at 35:14-36:7. However, Beacon is guaranteeing payment under the Plan. *See* Exhibit X at 000561. With respect to Beacon's commitment, the amount is largely dependent upon the yet-to-be-determined amount of BELFOR's allowed claim.

On May 14, 2021, BELFOR filed its Proof of Claim asserting a secured claim in the amount of $4,339,773.18. *See* Stipulated Facts at ¶33. Debtor disputes the claim. On the day the claim was filed, Debtor filed its first supplement to its Plan and Disclosure Statement. *See* Exhibit 3. In the first supplement, Debtor proposes to deposit $1.6 million *upon confirmation of the Plan* in an

escrow account designated for BELFOR to demonstrate its good faith and ability to pay BELFOR its allowed claim. *See id.* at ¶8. However, Debtor's proposal is based on its belief that the undisputed portion of BELFOR's claim is approximately $1.5 million. *See id.* at ¶7. On June 14, 2021, *the day the evidentiary hearing on the Motions commenced*, Debtor took additional steps to bolster the reality of plan funding by filing its second supplement to the Plan and Disclosure Statement. *See* Exhibit 18. Debtor advised that Beacon posted over $3 million in an account dedicated to funding the Plan. *See id.* at ¶6. Together with the settlement proceeds from Moonbeam Capital, Debtor reported that it would have no less than $5,803,916.66 available for distribution on the effective date of the Plan. *See id.* at ¶9. A hearing on the Disclosure Statement has not yet occurred.

<u>Analysis</u>

Based on the foregoing, the Court considers whether conversion, dismissal, or appointment of a Chapter 11 Trustee is appropriate in this case. Upon finding cause, with limited exceptions, a court must convert or dismiss a case pursuant to 11 U.S.C. §1112(b)(1):

> …[O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

Within §1112(b)(4) are examples of what constitutes "cause" for dismissal or conversion, including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *See* 11 U.S.C. §1112(b)(4)(A). However, the list in §1112(b)(4) is non-exclusive. *See In re Stone Fox Capital LLC*, 572 B.R. 582, 588 (Bankr.W.D.Pa. 2017). In addition to the enumerated list, a Chapter 11 petition is subject to dismissal if the Court finds the filing was not in good faith. *See id*. at 589 (citing *In re 15375 Mem'l Corp.*, 589 F.3d

605, 618 (3d Cir. 2009)). BELFOR asserts that the Debtor's petition was not filed in good faith and that the case is otherwise subject to dismissal or conversion pursuant to §1112(b)(4)(A).

To demonstrate that dismissal or conversion is appropriate under §1112(b)(4)(A), BELFOR must establish both prongs under the statute: (1) substantial or continuing loss to or diminution of the estate and (2) absence of a reasonable likelihood of rehabilitation. *See In re Grasso*, 497 B.R. 448, 455 (Bankr.E.D.Pa. 2013), *aff'd sub nom. Grasso v. Madison Capital Co.*, No. 13-4308, 2014 WL 1281123, 2014 U.S. Dist. LEXIS 44113 (E.D.Pa. Mar. 31, 2014). As to the first prong, a debtor's monthly operating reports are key to the determination. *See Mumma v. Vara* (*In re Mann Realty Assoc., Inc.*), No. 1:18-cv-683, 2019 WL 4780937, at *5, 2019 U.S. Dist. LEXIS 168132, at *15 (M.D.Pa. Sept. 30, 2019). As to the second prong, rehabilitation refers to a debtor becoming reestablished on a secured financial basis and the ability to establish a cash flow to meet current obligations. *See In re Wen-Kev Mgmt., Inc.*, No. 14-2196 (KSH), 2014 WL 7370050, at *4, 2014 U.S. Dist. LEXIS 177650, at *12 (D.N.J. Dec. 29, 2014). BELFOR bears the burden of establishing "cause" by a preponderance of the evidence. *See In re Commonwealth Renewable Energy, Inc.*, 550 B.R. 279, 283 (Bankr.W.D.Pa. 2016).

With respect to §1112(b)(4)(A), BELFOR failed to meet its burden. Debtor continues to operate and maintains tenants at the Property. Although the Debtor's monthly operating reports were admitted into evidence, BELFOR took no steps to explain its position regarding the first prong by citing to the reports.[10] Further, to the extent BELFOR cites to accruing administrative

---

[10]    The Court notes, however, that in the first monthly operating report for the period of January 5-31, 2021, the cash at the beginning of the month is reported as $247,026.79 while the last report in the exhibit for the period of April 1-30, 2021, identifies cash at the beginning of the month as $292,561.81 and cash at the end of the month as $277,353.05. *See* Exhibit GG. To the extent particular items in the reports are relevant to this analysis, it was incumbent upon BELFOR to direct the Court to the support for its arguments.

costs, a significant cost is associated with defending the Motions presently before the Court. While BELFOR had every right to bring the Motions, Debtor likewise had a right to defend without such defense being the sole justification for converting or dismissing the case. To the extent it is the administrative costs of this bankruptcy case and not the operating costs creating potential loss,[11] it is beneficial for the parties to cooperate in resolving matters rather than rushing to litigation going forward. Notably, the Debtor's Plan proposes to pay all allowed claims in full paving the way to a reasonable likelihood for rehabilitation and stable financial footing.

Debtor has taken steps to demonstrate the feasibility of its Plan by filing supplements though the Court need not determine that issue at this stage. Further, Beacon's substantial financial contribution to the Plan is persuasive evidence of Beacon's commitment to support the Debtor in future operations and redevelopment of the Property to address the tornado damage, whether by repair, demolition, or otherwise. Debtor is in the particularly unique circumstance of addressing how to best proceed amid a global pandemic compounded by the uncertain future of brick and mortar retail establishments. With respect to Debtor's intention for the Property, the Court found the testimony of Mr. Sklyaroff and Mr. Pryor to be credible and rational in light of current circumstances.[12] After the Debtor addresses creditors' claims, Debtor will be able to better assess the most appropriate rehabilitative steps going forward. Further, BELFOR failed to establish that Debtor must repair the damaged buildings to successfully remain in business, and the credible evidence supports the likelihood that Debtor can achieve rehabilitation. Based on the record,

---

BELFOR's description of the Debtor's operations as "barely break even" does not demonstrate substantial or continuing loss. *See* Hr'g Tr. 6/14/21 at 17:2-7.

[11]    Mr. Sklyaroff estimated costs for attorneys and other professionals in the amount of approximately $250,000. *See* Hr'g Tr. 6/14/21 at 139:20-140:2.

[12]    Without the evidence of substantial financial backing, the Court may have been inclined to view the testimony as credible but no more than generalizations and hypothetical, unsubstantiated intentions.

Debtor established that the proposed reorganization has plausibility and is far more than a pipe dream. Accordingly, BELFOR failed to meet the elements of §1112(b)(4)(A) to establish cause for conversion or dismissal.

Determining whether a petition was filed in good faith is a fact-intensive inquiry. *See In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 (3d Cir. 2009). While there is no exhaustive list of factors applicable to this determination, two inquiries are particularly relevant to the analysis: (1) whether the petition was filed with a valid bankruptcy purpose and (2) whether the petition was filed merely to gain a tactical litigation advantage. *See id.* at 618 & n.8. The Court considers the totality of the circumstances, and the burden is on the bankruptcy petitioner to establish that the petition was filed in good faith. *See id*. at 618.[13]

BELFOR has raised some relevant considerations. The Property is Debtor's primary asset, and BELFOR was pursuing foreclosure of its mechanic's lien in the State Court Action. There are few unsecured creditors, and no pressure from non-moving creditors. This bankruptcy case has been largely driven by the disputes between Debtor and BELFOR. Arguably, this case has been in the nature of a two-party dispute but for the limited involvement of Nations Roof first joining in the request for dismissal or conversion and later supporting Debtor's efforts to pursue its Plan. The Court considers and weighs these factors in the good faith analysis.

By showing that the petition preserves a going concern or maximizes the value of the bankruptcy estate, a party can demonstrate that the petition serves a valid bankruptcy purpose. In

---

[13]    Additional factors considered in the good faith analysis include the following: single asset case; few unsecured creditors; no ongoing business or employees; petition filed on eve of foreclosure; two party dispute which can be resolved in pending state court action; no cash or income; no pressure from non-moving creditors; previous bankruptcy petition; prepetition conduct was improper; no possibility of reorganization; debtor formed immediately prepetition; debtor filed solely to create automatic stay; and subjective intent of the debtor. *See Stone Fox*, 572 B.R. at 589.

this case, Debtor has demonstrated an intention to preserve its business. Though Debtor was involved in pre-petition litigation with BELFOR, lost its anchor tenant in 2020, and suffered adverse effects from the global pandemic, Debtor continues to maintain its Property for the remaining tenants with an intention to rehabilitate and/or repurpose the Property after it addresses the claims of creditors. In the course of this case, Debtor and Nations Roof, the second largest creditor and only other participating creditor, resolved their dispute regarding the amount of Nations Roof's claim. Debtor has taken prompt action with respect to BELFOR as well by filing the Adversary Complaint seeking a determination of the amount and secured status of BELFOR's claim. In addition, Debtor filed a Plan that proposes to pay allowed claims in full, including the claim of BELFOR. Further, Debtor seeks approval of a proposed settlement with Moonbeam Capital that will bring $2.8 million into the estate. Debtor's Plan is supported by Nations Roof, will resolve the claims against Debtor, and will place Debtor in a position to determine how to best proceed with respect to the Property. For these reasons, the filing appears to serve a valid bankruptcy purpose.

With respect to BELFOR's contentions that the bankruptcy case was filed merely to gain a tactical litigation advantage, the Court is not persuaded. The Court finds little significance to the discovery deadline in the State Court Action coinciding with the petition date. The allegation that Debtor filed the petition to avoid the deadline for production of documents in the State Court Action is unconvincing. Discovery related to BELFOR's claim would nonetheless proceed in the context of the bankruptcy case. In fact, discovery has been extensive in this case.[14]

---

[14]     To the extent non-debtors asserted the protection of the automatic stay in the State Court Action to avoid production of discovery, that too is an unconvincing argument that the bankruptcy filing was a litigation tactic. The likelihood that such a claim would only grant a brief reprieve appears to be confirmed

Further, the Court finds nothing nefarious about the commencement of the bankruptcy case in this forum despite the only connection being affiliated cases pending in this district. Notably, there has been no challenge to venue in this district. To the extent BELFOR contends that venue in this district was manufactured by the transfer from Moonbeam Capital to Beacon, the agreement to transfer was effective in September 2019 while the case was not filed until January 5, 2021. Therefore, the contention appears to be far-fetched, and the alleged benefit to litigating in this forum is unknown. BELFOR failed to elucidate its argument further on this point.

Perhaps the most serious item BELFOR identified is the Debtor's position with respect to the millions of dollars in insurance proceeds that Debtor is choosing not to pursue, at least at this time, from Moonbeam Capital. As has been established, Mr. Pryor, who handles Debtor's day-to-day operations, is entangled in numerous aspects of the operations of the Moonbeam entities, Beacon, and the Debtor. Further, he acknowledges duties to the Moonbeam entities and the Debtor in addition to the fiduciary duties owed to the bankruptcy estate and appears to acknowledge the potential for conflict. Mr. Sklyaroff, the ultimate decision maker for Debtor, relies heavily on Mr. Pryor and has multiple connections to Mr. Maksin and the Moonbeam entities. Further, Mr. Sklyaroff, *on behalf of Beacon*, specifically agreed not to pursue certain insurance proceeds received by Moonbeam Capital. In light of these mixed allegiances and connections, it is certainly logical to question whether the estate's interests are adequately protected. However, the Debtor has proposed a settlement with Moonbeam Capital that will bring $2.8 million into the estate and does not appear to limit the Debtor's ability to pursue additional proceeds.[15] The most compelling

---

by BELFOR's further report that the court ordered the non-debtors to respond to discovery requests. *See* Doc. No. 245 at ¶14.

[15]   Based on the relationships, there is reason to question whether there was a lack of incentive to vigorously negotiate on behalf of the Debtor where, at least at this time, Moonbeam Capital appears to

factor is the Plan's commitment to pay allowed claims in full with the pledge of Beacon, a commitment that is demonstrated through the posting of $3 million. Based on the totality of the circumstances, the Court finds the preponderance of the evidence supports a good faith filing.

Having found neither cause nor bad faith to justify dismissal or conversion, the Court turns to the request to appoint a trustee. Pursuant to 11 U.S.C. §1104(a), the court shall order the appointment of a trustee upon the following:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

*See* 11 U.S.C. §1104(a)(1)-(2). If grounds exist under either subdivision, then appointment of a trustee is mandatory; however, appointment of a trustee is considered an "extraordinary remedy" as there is a strong presumption that a debtor should remain in possession. *See In re Commonwealth Renewable Energy, Inc.*, No. 14-22724-GLT, 2016 WL 1599982, at *2-3, 2016 Bankr. LEXIS 1719, at *6-7 (Bankr.W.D.Pa. Apr. 18, 2016). The party seeking appointment of a

---

retain approximately $7 million and give up only $2.8 million. However, this Court is not in a position to determine based on this record whether Moonbeam Capital has legitimate defenses to the Debtor's pursuit of these additional funds and the reasonableness of the settlement. These issues may be more appropriately dealt with at a confirmation hearing on the Plan when the Court considers feasibility and the proposed settlement and release. If Debtor can demonstrate funding to pay allowed claims in full, the concern regarding pursuit of additional funds from Moonbeam Capital may dissipate. Unlike the facts in *15375 Memorial Corp.*, Debtor has a significant financial commitment, and there has been no clear breach of duties. *Cf. 15375 Memorial Corp.*, 589 F.3d at 623-25 (where debtors' decision-maker testified that filing a lawsuit against the related entities would jeopardize his job; the $1 million to be contributed by the related entities was not much of a concession in light of potential liabilities exceeding $300 million; and the record demonstrated that mixed allegiances prevented the decision-maker from protecting debtors' interests as evidenced by his negotiations regarding a demand note). Further, as discussed *infra*, the Court finds these concerns more relevant to the potential appointment of a trustee.

17

trustee bears the burden to establish the need for a trustee by clear and convincing evidence, and the determination is made on a case-by-case basis. *See Commonwealth Renewable Energy*, 2016 WL 1599982, at *2-3, 2016 Bankr. LEXIS 1719, at *6-7.[16]

Under §1104(a)(1), the examples of cause are not exhaustive and permit the Court to appoint a trustee in circumstances other than those specifically identified. *See Commonwealth Renewable Energy*, 2016 WL 1599982, at *2, 2016 Bankr. LEXIS 1719, at *7. "In finding that cause exists, the bankruptcy court has the necessary discretion to determine if the debtor-in-possession's conduct 'rises to a level sufficient to warrant the appointment of a trustee.'" *See Commonwealth Renewable Energy*, 2016 WL 1599982, at *2, 2016 Bankr. LEXIS 1719, at *6-7 (quoting *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 472 (3d Cir. 1998)). "This discretionary authority is consistent with the 'policy of flexibility' of the Bankruptcy Code's mandate of protecting creditors while providing the debtor a second chance." *See Commonwealth Renewable Energy*, 2016 WL 1599982, at *2, 2016 Bankr. LEXIS 1719, at *7 (quoting *Marvel Entm't*, 140 at 472).

Courts have found cause to appoint a trustee in certain instances where there is evidence of acrimony between the parties beyond the healthy conflicts that always exist between a debtor and creditor. *See Commonwealth Renewable Energy*, 2016 WL 1599982, at *2, 2016 Bankr. LEXIS 1719, at *8. There is undeniably a degree of acrimony between BELFOR on the one hand and Debtor and Beacon on the other. That acrimony has impacted this bankruptcy case, which has proceeded largely in the nature of a two-faction dispute. While the parties have had opportunities to reach a resolution, two separate attempts at mediation have proven unsuccessful. To date,

---

[16]     Based on the evidence, testimony, and argument presented at the evidentiary hearing, BELFOR appears to have abandoned some of the allegations originally raised in its lengthy Trustee Motion.

however, the litigation has been primarily the result of the Motions currently before the Court. While the Motions raise important considerations and were not filed without merit, the Debtor certainly had a right to respond and defend. Overall, the Court does not view the level of acrimony in this case to be indicative of a complete inability of the parties to resolve matters cooperatively in the future.[17] With the resolution of these Motions, the case will likely proceed with the typical healthy conflicts that always exist between a debtor and creditor. Based on the record, the Court finds the level of acrimony insufficient to meet the burden of appointment of a trustee.

Perhaps the most compelling arguments raised by BELFOR involve the alleged conflicts of interest and the impact on Debtor's fiduciary obligations under the Bankruptcy Code. In order to remain a debtor-in-possession, a debtor owes fiduciary duties to creditors and the estate. *In re Morningstar Marketplace, Ltd*, 544 B.R. 297, 303 (Bankr.M.D.Pa. 2016). Among these is a duty of loyalty requiring the avoidance of self-dealing and conflicts of interest. *Id*. Courts consider whether a conflict arises based on a debtor's management having multiple roles, whether there is an unwillingness or inability to pursue claims or causes of action, and a debtor's dealings with insiders. *Id*. BELFOR's concerns relate to this duty of loyalty.

In this case, it is undisputed that insurance checks made payable to both Debtor and Moonbeam Capital were received by Moonbeam Capital in an amount exceeding $9 million. Meanwhile, entities that performed repair work on the Property remain unpaid. The insurance proceeds were not used to repair the Property, and the Property remains significantly damaged. As

---

[17]   For example, to the extent BELFOR challenges the terms of the Debtor's settlement and proposed release of Moonbeam Capital, BELFOR is encouraged to specifically identify its issues and suggest appropriate modifications. The Court expects Debtor will work cooperatively with BELFOR to achieve the best result for creditors and this estate and demonstrate good faith.

part of Beacon's agreement to purchase Moonbeam Capital's equity interest in Debtor, Beacon agreed it had no right to insurance proceeds received by Moonbeam Capital prior to the effective date, and Beacon made no claim to the proceeds received by Moonbeam Capital after that date. Given the strong connections among Mr. Sklyaroff, Beacon, Mr. Maksin, Mr. Pryor, and the Moonbeam related entities, BELFOR questions the legitimacy of any efforts to recover the insurance proceeds on behalf of the Debtor. Whether and to what extent Debtor has a right to pursue recovery of the proceeds has not been developed on the record to date. However, as set forth in the Plan, Debtor negotiated a settlement with Moonbeam Capital that will provide $2.8 million for Plan funding. Given the connections maintained between Debtor and Moonbeam Capital, the reasonableness of the settlement and perhaps to a greater extent the accompanying release have raised questions regarding whether Debtor is acting in the best interests of the creditors and the estate. In addition, legitimate questions have been raised regarding the Debtor's apparent disinterest in pursuing the additional $7 million of insurance proceeds received by Moonbeam Capital.

Considering these legitimate concerns and based on this record of inextricably linked companies and individuals with overlapping duties and potentially conflicting interests, the argument in favor of a trustee is a close call. However, Debtor has proposed a Plan to pay all allowed claims in full. Further, Debtor has supplemented its Plan to establish the legitimacy of Beacon's funding.[18] With this in mind, it is difficult to persuasively argue that Debtor has failed

---

[18]     BELFOR did not have the benefit of this knowledge until the morning the evidentiary hearing commenced as the second supplement was filed June 14, 2021; however, BELFOR advised the Court that the supplement did not change its position on its Motions. *See* Hr'g Tr. 6/14/21 at 12:9-24.

to act in the best interests of creditors and the estate. On this record, BELFOR failed to establish by clear and convincing evidence that there is cause to appoint a trustee *at this time*.

Further, the Court finds no basis for appointment of a trustee pursuant to the more flexible standard of §1104(a)(2). In light of the Plan proposed by Debtor, the Court cannot find that appointment of a trustee would preserve any value for creditors and may only increase the cost of administration. However, the Court is mindful that the proposed Plan has not been tested through a confirmation hearing. As such, the feasibility of the Plan and the appropriateness of the proposed settlement and release have not been determined. Because these are significant considerations, the appointment of a trustee is denied *without prejudice at this time*.

The appointment of a trustee, however, may be reconsidered by this Court *sua sponte*. The second supplement to the Plan is significant to the Court's decision to permit Debtor to remain as a debtor-in-possession. If Debtor is unable to clearly demonstrate the feasibility of its Plan in light of the Debtor's apparent disinterest in the $7 million of insurance proceeds retained by Moonbeam Capital, it may become necessary for an independent trustee to assess whether further recovery should be sought from Moonbeam Capital for the benefit of the estate. By acting promptly to demonstrate the reality of the necessary funding, Debtor can avoid needless delay, increased administrative costs, and further concerns regarding Debtor's ability to discharge its fiduciary duties. Debtor should require no further prompting to establish the reality of the intention set forth in the Plan.

Conclusion

Based on the foregoing, *BELFOR USA Group, Inc.'s Motion for an Order Under 11 U.S.C. §1112(b) Dismissing the Debtor's Case or, in the Alternative, Converting the Case to Chapter 7* and *BELFOR USA Group, Inc.'s Expedited Motion for an Order Under 11 U.S.C. §1104*

*Appointing a Trustee to Administer the Debtor's Estate* are denied. Upon further development of the record regarding the Debtor's Plan and the proposed settlement with Moonbeam Capital, the Court may reevaluate the need for a trustee in this case. An order will be entered consistent with this Memorandum Opinion.

Dated: <u>July 14, 2021</u>                                  <u>__/s/ Carlota M. Böhm_____</u>
                                                                              Carlota M. Böhm
                                                                              Chief United States Bankruptcy Judge

**MAIL TO:**

Office of the United States Trustee

Ann Marie Uetz, Esq. and William McKenna, Esq.

Kirk Burkley, Esq. and Kerri Sturm, Esq.

FILED
7/14/21 11:06 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA